UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE POLAROID ERISA LITIGATION | MASTER FILE: 03 CV 8335 (WHP) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER PERMITTING REMAINING SETTLEMENT FUNDS TO REVERT TO THE UNITED STATES TREASURY**

Co-Lead Counsel moves this Court to revert the $197,326.58 remaining in the Polaroid ERISA Qualified Settlement Fund ("PEQSF") to the United States Treasury in accordance with the Court Approved Plan of Allocation.

**I. STATEMENT OF FACTS**

On June 25, 2007, the Court issued an Order granting final approval of the $15,000,000 Settlement and the Plan of Allocation, and entered a Final Judgment in this action. As soon as the Court's order approving the Settlement became final, State Street Bank and Trust Co., as Plan Administrator, began the process of retrieving the plan data to calculate the Plan of Allocation. Once the data was fully retrieved, the Plan Administrator performed calculations in accordance with the Court-approved Plan of Allocation to determine each class members' pro-rata share of the settlement.

On June 16, 2008, the settlement proceeds were distributed by check to the last known addresses of the class members. A national change of address search (NCOA) was performed prior to mailing the checks to the class members. When the checks were mailed, a toll-free hotline and a website maintained by Co-Lead Counsel was updated to advise class members that

settlement checks had been mailed, and to contact counsel if they needed to update their address or if they did not receive a check.

Between June and December 2008, the Plan Administrator reissued 113 checks to class members who had moved, lost or misplaced their checks, or to the beneficiaries of deceased class members.  In late 2008, at the request of Co-Lead Counsel, the Settlement Administrator, Garden City Group, performed a "skip trace" on those class members whose checks had been returned as undeliverable or who failed to cash their checks, in an attempt to distribute the remaining settlement funds. The skip trace utilized the class members' social security numbers, among other things, and accessed their credit history in an effort to locate more current and accurate mailing addresses and telephone numbers for the class members.

On January 5, 2009, the Plan Administrator reissued over 500 checks to class members based on the updated information derived from the skip trace. Between February and December 2009, the Plan Administrator reissued another 11 checks to class members. In 2010, the Plan Administrator reissued 3 checks to class members.

In the beginning of 2011, the Plan Administrator transferred all remaining settlement funds to the trust account of Co-Lead Counsel for further distribution to class members that requested reissued settlement checks in the future.  In February 2011, Co-Lead Counsel reissued one check to a class member. In June 2011, Co-Lead Counsel reissued one check to a class member.  The June 2011 check reissue was the last request for distribution that Co-Lead Counsel has received, and the last settlement distribution that it has made.  Co-Lead Counsel has not been contacted by any Polaroid settlement class member or their beneficiaries to request a check reissue since June 2011.

## II.  PROPOSED ALLOCATION

The Plan of Allocation states:

> After the passage of one full calendar year from the date of State Street's mailing of the last distribution pursuant to this Plan of Allocation, Co-Lead Counsel shall determine the aggregate value, if any, of forfeited distributions under this Plan of Allocation, and shall, within 60 days thereafter, make a motion to the Court for approval for final distribution of any such forfeited amount. Such a proposal would include a redistribution to the Class members if economically practicable, escheat of the forfeited funds to the state, or any other means approved by the Court.

Plan of Allocation, at 4 (Declaration of Amy Williams-Derry, Exhibit A).

It has been over one full calendar year since the last distribution was mailed pursuant to the Plan of Allocation. As described above and in the supporting Declaration of Amy Williams-Derry submitted herewith, Co-Lead Counsel has diligently worked to locate remaining settlement class members, and has maintained the website and toll free hotline for the last four years in hopes other class members would come forward and request their pro-rata share of the settlement.

At the Final Approval Hearing held on June 22, 2007, the Court said with respect to any residual funds, "It is my firm view that if there are any undistributed funds that can't be distributed in a supplemental dividend to class members, that any such moneys should revert to the United States Treasury." (Transcript, June 22, 2007, 12:3-6)

As of September 20, 2012, the remaining balance of the settlement fund is $197,326.58, and there are approximately 8,000 Settlement Class Members. A redistribution of the remaining funds is not economically practicable considering the expense of calculating the redistribution amounts for each class member, running an updated NCOA search, printing and mailing checks, and the related administration time involved in managing the redistribution and associated tax reporting. Co-Lead Counsel has already expended many hours over the last four years trying to

locate Class Members, maintaining the website and the toll-free hotline, and for miscellaneous administrative duties related to these attempted distributions.  After the costs of redistribution are deducted, there would be very small amounts available for redistribution to the settlement class members.

Therefore, in accordance with the Plan of Allocation and the prior direction of the Court, Co-Lead Counsel respectfully requests the Court issue an Order reverting the remaining $197,326.58 in the PEQSF to the United States Treasury.

### III.  NATIONAL UNION'S COUNTER-PROPOSAL SHOULD BE DENIED

Non-party National Union Insurance Group, Inc. (together with AIG Domestic Claims, Inc., "National Union")[1] recently submitted a letter to this Court—signed by counsel for the Individual Defendants[2]—seeking permission to propose an alternative distribution of the remaining balance of the settlement fund.  Specifically, despite the fact that National Union failed to negotiate a clause calling for the return to it of any unclaimed funds and despite the fact that the *entire* settlement fund was paid in consideration for the release of the Individual Defendants' liability, National Union asks this court to enter an order "returning" eighty percent of the remaining $197,326.58 to National Union.  Because the equities weigh heavily against returning any portion of the settlement fund to defendants—or their insurer—this request should be denied.

Although the Second Circuit permitted the return of unclaimed settlement funds to the defendant in *Van Gemert v. Boeing Co.*, 739 F.2d 730, 736-37 (2d Cir.1984), none of the factors relevant to that decision support National Union's argument here.  First, the *Van Gemert* court

---

[1]  *See* Williams-Derry Decl., Ex. B (attaching March 15, 2007 Settlement Agreement), ¶ 1.23 (defining "Insurer").

[2]  The October 5, 2012 letter was signed on behalf of National Union by Steven F. Cherry and David Donovan, who have previously made appearances in this case as counsel for the Individual Polaroid Defendants.  *See* Dkt. No. 35, 158.

4

relied on the fact that Boeing's liability was based, not on the violation of a public law, but rather on its "breach[ of] private contractual duties." *Id.* at 736.[3] Conversely, here the Individual Defendants did not simply breach duties to parties with whom they had contracted. Rather, the Individual Defendants settled claims resulting from purported violations of duties owed to a broad class of approximately 8,000 plan participants pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

Second, the *Van Gemert* court relied on the fact that Boeing "acted without malice, without bad faith and relied on the advice of others before taking each step." *Id.* at 737. Because the parties settled prior to any adjudication on the merits, there was no finding of fact regarding Defendants' good or bad faith. However, Defendants are not entitled to a presumption of *good* faith merely because they settled before the case was decided on the merits. Moreover, the Individual Defendants' purported wrongful acts, including breaches of ERISA's fiduciary duties, are qualitatively different than the purported wrongful acts at issue in *Van Gemert*, where Boeing attempted, unsuccessfully, to adhere to the notice requirements for the redemption of convertible debentures.

The factors considered by the Fifth Circuit in *Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807 (5th Cir. 1989), also weigh against reversion to the Polaroid Defendants' insurer.[4] The *Wilson* court relied on its determination that "the purpose of the back-pay fund . . . was

---

[3] Although the court used the words "private" and "public" in evaluating whether reversion to defendant was appropriate, it did not simply consider whether the action was brought by the government as opposed to a private party. Rather, the relevant inquiry was whether the action was based on a private, contractual duty owed only to the parties of the contract as opposed to a public, statutory duty. *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2d Cir. 1984) (noting that in a prior case, the Southern District held that unclaimed funds should not be returned to defendants because the suit, brought by the SEC, was brought in the *public* interest to enforce the federal securities laws.") (citing *SEC v. Golconda Mining Company*, 327 F.Supp. 257, 259–60 (S.D.N.Y.1971) (emphasis in original).

[4] Like the *Van Gemert* court, the *Wilson* court also relied on defendants' lack of bad faith. *Wilson*, 880 F.2d at 815. For the reasons noted above, this factor cannot be held to favor reversion in this case.

substantially achieved." *Id.* at 812.  The court determined that the "purpose of this fund was to 'make whole' victims of unlawful employment discrimination" and that this purpose was satisfied because "[e]very *bona fide* class member who came forward with a valid claim was paid his full measure of compensation." *Id.*

Conversely, here the purpose of the Settlement Fund was not simply to compensate class members.  Rather, pursuant to the explicit terms of the Settlement Agreement, the Cash Amount was paid "[i]n consideration of all of the promises and agreements set forth in this Settlement Agreement," including the agreement by Plaintiffs and the class to "absolutely and unconditionally release" their claims against the Released Parties, including the insurer. Settlement Agreement ¶¶ 7.2, 3.1, 1.37 (defining "Released Parties").  It would be inequitable to permit Defendants—and their insurer—to benefit from an unconditional and absolute release of these claims without a similar unconditional and absolute payment of consideration.  *See Diamond Chem. Co., Inc. v. Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 218 (D.D.C. 2007) (rejecting defendants' assertion, based on *Wilson*, that they had paid the settlement fund "for the specific and limited purpose of compensating the class" because it "obscures the reality that the settlement not only compensated those Plaintiffs who made claims to the fund, but *also relieved Defendants of liability* from Plaintiffs' individual claims.") (emphasis added) (citations omitted).  Nothing in the Settlement Agreement indicates that Defendants—or their insurer— would be entitled to repayment of any portion of their consideration based on the failure of certain class members to accept the settlement funds made available to them.[5]

---

[5] Notably, Defendants negotiated a rather limited Termination clause, under which the Settlement Agreement may terminate only if "(a) the Court declines to enter the Final Order, (b) the Final Order entered by the Court is reversed or modified in any material respect on appeal, or (c) the Independent Fiduciary does not approve the Settlement . . . ." Settlement Agreement ¶ 9.1 (Exhibit B to Williams-Derry Decl.).

6

Moreover, even to the extent the fund was intended to compensate class members, this case is distinct from *Wilson* in that Defendants—and their insurer—cannot credibly argue that all claiming class members have been fully compensated.[6] The Settlement amount did not provide enough funds to fully compensate all class members for the losses to their retirement savings. *See, e.g.*, Final Plan of Allocation at 3 (explaining that each Class Member's recovery will be based on an assigned "Net Loss Percentage, reflecting the percentage of the Class Member's Net Loss in relation to all Class Members' Net Losses") (Williams-Derry Decl., Ex. A). Under these facts, it would be inequitable to allow Defendants—or their insurer—to reclaim any part of the funds that were designated as compensation for losses to the Plan.

Finally, the *Wilson* court relied on the purpose of Title VII, which it determined was "compensatory rather than punitive." *Wilson*, 880 F.2d at 815 (comparing Title VII to the Sherman Act, under which reversion to Defendants was not equitable because "the overriding policy of [the Sherman Act] is punishment and deterrence."). However, the purpose of ERISA is not limited to providing compensation to plan participants.

Although one primary purpose of ERISA is to ensure that plan participants "receive their full benefits," 29 U.S.C. § 1001b(c), Courts have made clear that another important purpose of the private right of action under ERISA is deterrence of fiduciary breaches. *See, e.g.*, *Fin. Institutions Ret. Fund v. Office of Thrift Supervision*, 964 F.2d 142, 149 (2d Cir. 1992) ("This broad view of participant standing under ERISA is further supported by ERISA's goal of deterring fiduciary misdeeds); *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*,

---

[6] This is not to mention the obvious fact that non-claiming Class Members have not been fully compensated for their losses. Although adequate notice was provided to the Class, Defendants are not without blame for the failure of some Class Members to accept their settlement funds. This litigation spanned many years, in part due to Defendants' aggressive defense and other delay tactics. As a result, Class Members or their beneficiaries were harder to locate when the case finally resolved. Rewarding Defendants—or their insurer—with the unclaimed funds would create further incentive for defendants to delay in future litigation.

957 F.2d 1020, 1029 (2d Cir. 1992) (noting the prior case law "reflects our belief that ERISA's purpose of deterring pension plan abuse is frustrated when solvent breaching fiduciaries are allowed to escape the consequences of their actions.").[7] Another fundamental purpose of ERISA is to prevent plan fiduciaries or parties in interest from using plan assets in their own interest or from otherwise putting their own interests ahead of those of plan participants. *See, e.g.*, ERISA §§ 404, 406, 29 U.S.C. §§ 1104, 1106. Permitting Defendants—and their insurer—to receive unclaimed benefits owed by Defendants to plan participants would frustrate these fundamental purposes of ERISA.

## IV.  CONCLUSION

For the reasons stated herein, Co-Lead Counsel respectfully requests that the Court issue an Order reverting the remaining $197,326.58 in the PEQSF to the United States Treasury.

Respectfully submitted this October 19, 2012.

> By:  s/ Amy Williams-Derry
> Derek W. Loeser (DL-6712)
> Lynn Lincoln Sarko (LS-3700
> Amy Williams-Derry (AW-5891)
> KELLER ROHRBACK L.L.P.
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101
> Telephone: (206) 623-1900
> *Co-Lead Counsel for Plaintiffs*

---

[7] Congress also intended for the private right of action to have a deterrent effect. *See Herman v. S. Carolina Nat. Bank*, 140 F.3d 1413, 1423 (11th Cir. 1998) (citing congressional Conference Committee report in which the conferees explained that "the need for strengthened enforcement and deterrence of violations of ERISA applies not only to the Department of Labor, but to judicial oversight of private rights of action affecting employee benefit plans. It remains the intent of Congress that the courts use their power to fashion legal and equitable remedies that not only protect participants and beneficiaries but deter violations of the law as well.") (emphasis added) (citing H. Conf. Rep. No. 101-386 (1989), reprinted in 1989 U.S.C.C.A.N. 3018, 3035-36).

>Joseph H. Meltzer (JM-8493)
>KESSLER TOPAZ MELTZER & CHECK, LLP
>280 King of Prussia Road
>Radnor, PA 19087
>Telephone: (610) 667-7706
>*Co-Lead Counsel for Plaintiffs*
>
>Curtis V. Trinko (CT-1838)
>LAW OFFICES OF CURTIS V. TRINKO, L.L.P.
>16 West 46th Street, 7th Floor
>New York, NY 10036
>Telephone: (212) 490-9550
>Facsimile: (212) 986-0158
>*Liaison Counsel for Plaintiffs*